UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STEPHEN SWAN | ) | |
| 2462 Wyoming Avenue | ) | |
| Laramie WY 82070 | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CA No. _____ |
| | ) | |
| CHRISTINE WORMUTH | ) | |
| Secretary of the Army | ) | |
| 101 Army Pentagon | ) | |
| Washington DC 20310-0101 | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**

This is a non-monetary claim to remand to the Secretary of the Army to reconsider decision # AR2019-0009463 (22 April 2021) of Army Board for Correction of Military Records (BCMR) denying voidance of promotion nonselections to Major, reinstatement with an adjusted date of rank at Major, or in the alternative denial of Special Selection Board (SSB) promotion reconsideration to Major. The complaint is limited to seeking a remand to reconsider the latter denial of SSB.

***Summary***

The complaint is limited to seeking reconsideration of SSB denial after the BCMR applied the wrong harmless error test, and after Swan's application presented a *prima facie* case from the Army's own several, official opinions justifying an SSB relook - that lack of minimum 1 year or 12 months command time (Swan had 9 months), was an error or injustice conceded not the fault of Captain Swan, but arose amid exigencies of multiple wartime deployments and assignment freezes. Army's 2016 official response to a Congressional inquiry as to the likely cause of promotion non-selection to Major, was this reason alone - "principal discriminator" causing his board scores to fall below the necessary "fully qualified order of merit."  Furthermore, official Army post-board instructions for his considerations stated an officer was "at risk for promotion failure" in Swan's

branch of Field Artillery without a minimum 1 year command time, stating this was the career-ending equivalent of a "derogatory Referred-Officer Evaluation Report" (OER) in an officer's file.

This presented a *prima facie* case to qualify for an SSB in that an officer need only show an error or injustice that "might have affected the outcome of the board's decision." [1]  Instead, the BCMR applied the wrong higher standard, and impossible burden placed on Swan, of absolute proof  the error or injustice alone was the "sole reason" for non-selection, and he would certainly have been otherwise promoted. This is termed the "but for" test that courts have long found inappropriate and misapplied for SSB or Standby-Advisory Boards ('but for' the error officer would have been promoted).[2]  Rather, once an officer presented *prima facie* evidence for an SSB, as here, the burden shifts to the Army or BCMR to prove that despite the error the officer would <u>not</u> have been promoted in any event. The Swan BCMR failed to even apply the latter whether he would  not have been promoted despite error (with 1 year command time).  Because the BCMR failed to apply the correct harmless error standard to deny SSB consideration, and even failed to discuss any of its SSB rationale, the decision was arbitrary and capricious. The case should be remanded to either grant an SSB relook, or to have the BCMR reconsider SSB under the appropriate harmless error test, or to articulate its rationale for denying an SSB.

JURISDICTION AND VENUE

Jurisdiction is conferred under the Administrative Procedure Act, U.S.C. § 702.

Venue is proper as the Defendant, Secretary of the Army by statute takes final action on all correction board actions and functions, 10 U.S.C. 1552. [3]  The Secretary of the Army is by officially published source listed as found *only* in this Washington DC district address, not a Virginia address,

---

[1] The seminal case on BCMR consideration on voidance or promotion nonselections, and for convening the alternative SSB, is <u>Porter v. United States</u>, 163 F.3d 1304, 1324 (Fed.Cir.1998).

[2] <u>Porter</u>, 1316-1318; 1322 (referred to as "Sanders-Engels line of cases").

[3] 10 USC 1552 (a)(1)  Secretary....may correct any military record...when the Secretary considers it necessary to correct an error or remove an injustice....such corrections shall be made by the Secretary ....Corrections under this section shall be made under procedures established by the Secretary concerned.....decision is final and conclusive on all officers of the United States...."

and this DC address has traditionally accepted service.[4]  The intent for restricting the Pentagon to only a Washington DC address and DC zip code is discussed below.

With respect to venue, the Secretary has since the nation's founding, and will continue to, performs significant official duties or business, including with the President and staff, executive branch or other executive agencies, in Washington DC.  Business with Congress includes the defense budget entailing operation, maintenance, and deployment of Army forces, conducting lobbying activities, and intelligence on congressional intent and future policies, including congressional oversight of the correction boards functions.  Congressional affairs includes significant time answering constituent and congressional inquires.  Congressional duties have risen significantly since 1980s and are increasing part of the services's overall functions.[5]

For example, the Defense Department's [offices of legislative liaisons] is discussed in the following excerpt from the January 1990, White Paper on The Department of Defense and The Congress -

> In 1988 over 245,00 hours were spent responding to nearly 18,000 Congressional letters [relating to acquisition issues alone]. In 1984 (the latest year for which data are available) there were 599,000 telephonic inquiries from Congress. The Department pres ents well over 1,000 briefings to members and staff each year. Senior Department officials spend an average of 3,000 hours per year preparing for and presenting testimony to Congress.[6]

A former Army Chief of Staff (1984-87), previous Vice Chief, and previous Senior Military Advisor to the Secretary of Defense, and Director of Joint Chiefs of Staff, has stated,

> having worked closely with the Army Secretary and other duties for nearly 10 years...my general observation is that a significant part of official duties of the Secretary are conducted in Washington DC, to include through staff, and deputies, and other senior subordinates....I would agree the intent of locating military headquarters to Washington DC in 1900s would include that reason of conducting a significant part of official duties there.  Transfer to the Pentagon building in World War 2, just across the Potomac River, was due to limited space

---

[4] https://www.defense.gov/Contact/Mailing-Addresses/.    and see https://www.govinfo.gov/content/pkg/ CDIR-2018-07-27/pdf/CDIR-2018-07-27-DEPARTMENTS-5.pdf

[5]  Robert Vellella, LT, US Navy, *Organization and Functions of the Services' Offices of Legislative Liaisons,* Naval Postgraduate School (1991), at 38.

[6] *Offices of Legislative Liaisons,* at 18.

at the National Mall, and in no way diminished this significant ongoing official businesses of the Army Secretary in Washington DC.

Declaration of John A. Wickham, Jr. , 2 March 2021.[7]

Lastly, the civil litigation division of the Army is located in Fort Belvoir, Virginia. They serve as consultant to the US Attorney's office in District of Columbia as agency counsel.  And military command-and-control of Fort Belvoir units falls under The United States Army Military District of Washington (MDW) Command, which is headquartered and located at Fort McNair in Washington, D.C. Besides Fort McNair, the following installations are included under the umbrella of the MDW's command:

Joint Base Myer–Henderson Hall, Virginia
Fort Belvoir, Virginia
Fort A.P. Hill, Virginia
Fort Meade, Maryland.

## PARTIES

Plaintiff, Stephen Swan, a former Regular active duty officer at the rank of Captain grade 03, presently a Major grade 04 in the United States Army National Guard; on extended active duty until June 2021, returning to traditional National Guard duty as a Major.

Defendant, Christine, Wormuth, in her capacity, is the Secretary of the Army.

## FACTS

1.      The Maj Swan in 2005 completed the Officer Basic Course and assigned 4th Brigade 10th Mountain Division. Ex.  B 24 (OERs); Ex. D 2 (his Battalion Commander).[8]  The unit was activated in place under STOP-LOSS, meaning during this restriction officers were not

---

[7] Army Chief of Staff 1983-87. Plaintiff ' counsel will make this declaration available if requested or in subsequent pleadings.

[8] For convenience Exhibits referred to documents in the record submitted to the BCMR.

permitted to PCS. Ex. D.2.  This also meant until this restriction was lifted, Maj Swan was unable to attend the FA  Captains Career  Course (CCC).  The CCC and the predictable follow on battery command, were required milestones to stay competitive for promotion to major. Ex. C 3-8 (FY 13 MAJ promotion board statistics).

### 2005-09  OIF Surge; 14 month deployment; backlog for career course /battery command

2.  The STOP LOSS was an unusual war time freeze on even enlistments due to expire. It was during the  Iraq "surge" when chaos reigned, and return of US troops necessary.

3.  Maj Swan was eventually deployed with his brigade to Iraq for 14 months into January 2009 . Ex. Ex D 1. So essentially Maj Swan was frozen out of his command course. As a result there was a backlog to attend, about two years to complete the CCC.  Ex. D 2.

4.   When his unit re-deployed in 2009 Maj Swan received orders for CCC in June 2009. Ex. B 16-17.  However, when the stop loss was lifted many field grade officers were released so there was a vacuum, a shortage in the brigade of experienced S-3 officers.  Acting on the request of the Army through his Battalion commander, Maj Swan stayed an additional three months as acting Battalion S3 until September 2009. This would "transition the unit and provide continuity"  because there was no continuity in new field grade officers, the unit would come to a standstill.  Maj Swan's adjusted CCC orders were approved by senior unit officers and `his branch for a 3 month delay until September 2009.  Ex. B 17 (orders and amendment). Ex. D3 (battalion CO).    In other words, acting through its senior officers, *the Army* in effect is approving the 90 day delay in is CCC.  Maj Swan's three prior OER's all recommended completion of the career course in follow-on battery command. Evaluations rated him highly. Ex. B 19-19A, to 23.

5.  Maj Swan completed the captain's career course in March 2010. Exhibit B 18.

OEF 2010-2011 Afghanistan deployment; 18 month battery command queue;

6.   During deployment Maj Swan was frozen out of command  opportunities until redeployment stateside in 2011.  At that time he was told of the 18 month wait, which was early because the average at the 10th Mountain was about 24 - 36 months. Even that wait would not make him competitive for major. So now he was allowed an exception to Permanent change of Station (PCS) minimum time-on-station.  The 10th Mountain was also an excessively long wait as it was a infantry division which was infantry heavy, not many artillery units as other posts to take a command. But OEF restricted movement until now.  Ex. D 4; Ex. F 1 (command queue trends).

7.   After explaining the critical nature of completing battery command, his entire command group and his branch, granted him an exception with early release to PCS to another post and directly to an artillery unit where battery command would be available in approximately 8 to 12 months. This was approved.   Exhibit D 4. He assumed command at Fort Sill OK on 27 September 2012.  Ex. B6.  But this attempted remedial early release to get command, proved too late.

8 .  It was war time events beyond his control that delayed assumption of command.  Such as the two deployments in the stop loss, back log at CCC, transitioning army brigade to provide continuity, and lengthy command que at Fort Drum.  It was not OER lack of competitiveness that limited command assignment.  Ex. B 7-14.  They all recommended battery command.  Although the 1 report preceding his command did not list battery command because on the very day of that OER, 27 September, Maj Swan had already assumed command on 27 Sept, and that's why his senior rater thought it would look odd recommend battery command after he already assumed command.

9.   To confirm Maj Swan was competitive to get battery command is the two OERs as a commander -- was among his best, above center of mass.  Ex. B 5. ( "surpassed all expectations. he is an exceptionally talented leader.").

9A.   Moreover the later congressional inquiry in 2018 on behalf of the Army does not find that Maj Swan was delayed in obtaining command assignment for any lack of competitiveness in his OERs,  rather he had only 9 *rated* months in command in *his OER records* when the promotion

board met, and requirement is at least 12 months.  When the Board met he *had* been serving as commander for actually the required 12 months, but to due to events beyond his control involving arcane reporting and minimum supervision times, it was a non-rated period. —

(1).  Normally OERs are prepared after change of duty, or change of rater.  There are exceptions.  He took command September 2012 and after 9 months his Brigade Commander (Senior Rater SR) left early due to war time post deployment deactivation (Army needed him elsewhere). So SR prepared a "senior rater option" OER when the rated officer is up for promotion or SR does not want supervision time forfeited under new SR unfamiliar with prior duties.[9]  Swan got a SR option for 9 months ending 26 June 2012.

(2) Swan's rater battalion commander, was planning a rater "complete the report" in September 2013 used primarily for officers eligible for selection boards, to certify in the record meeting a particular qualification or career benchmark. Id para 3-53. This would be 12 months in command.  However, the rater Battalion Commander departed late July 2013 earlier then expected also post-deployment deactivation, prompting urgent reassignment.

(3) When September 2012 board deadline arrived the new rater could not issue a complete-the-record showing Swan had been rated in command for 12 months. The rater did not have the minimum 90 days supervision time, only about 45 days.[10]

(4) As a result, when Swan's records were considered by the selection board in 2013 (his final look) he had 9 rated months in command but *had served 12 months in command*, ultimately completing over 18 ½ months by the second Command OER in March 2014.  But due to war time deployments freezing reassignment, national emergency stop loss, and other related assignment exigencies including deactivation, an inexorable chain of events like dominos fell that could not

---

[9] Army Regulation 623-105 para 3-55. The goal to complete an OER at least 6 months supervision or 90 days minium.

[10] The second command OER with 12 months (26 June 2013 to 31 March 2014) shows a "Q" non-rated code with 8 months rated, although time period is 9 ½. This is consistent with new rater not supervising until arrival in early August 2013, about 6 weeks after June 26; insufficient time for a complete-the-report in September 2013. Army Regulation 623-105 (non rated codes)

change direction resulting in delayed command course, delayed assignments, a "lock out" from, and

delay in the battery command que.

9B.   After promotion non selection, the response of the Army to the Maj Swan's

congressional inquiry was necessary, determining that the

> the biggest discriminator in his evaluation for the primary zone was that he had completed
> no battery command *** trends have repeatedly shown that 12 to 18 months battery
> command are principal discriminator for the FY 13 major promotion board * * * officers
> selected by  the FY 14 board (above the zone consideration] had completed a command
> opportunity of 12-18 months and also got brigade [FSO] position that place them above the
> "fully qualified" order of merit ...However, CPT Swan at the time of the FY 14 board
> [above the zone consideration] had only 9 months of a battery command evaluation. * * *
> although his service was admirable, his overall score did not place him above the fully
> qualified order of merit...

9C.   Furthermore, official Army post-board statistics concluded that a officer was "at risk

for promotion failure" in his branch Field Artillery without a minimum 12 months command time

and that this would be the equivalent of a derogatory referred OER in his file. A huge red flag on

his record.

10.   With respect to injustice Maj Swan had 2 very favorable OERS as commander, and

highly favorable both above center of mass.  So this paints the minimum time threshold as a kind of

automatic career "kill-switch" that sleeps walks blind during these war time exigencies and stop

loss, regardless of his great reports.   He even had two OERs in command at highest rating

"above center of mass."  But this now was too late.   He missed the FY 2014 board requirement by

3 months. Even this seems arbitrary when he completed 10 years with excellent reports, and likely

why so quickly promoted in Army National Guard of the United States, ARNGUS.

11.   Maj Swan only had 9 rated months in command, when the requirement is at least 12

months completed in command before the last board. Perhaps it could have been 2 or even 1 month

in command but still shy of the 12 months, and still passed over. When we are comparing his record

of 9 months with someone having precisely 12 months, the Army plods along mindlessly, lacking

flexibility in these situations not compensating or altering the criteria, or inserting a non-prejudicial

statement for lack 12 rated months command not due to fault of officer. Such as in other non-select

SSB cases were officer's gap in performance "not-rated time" is adequately explained in their record.[11]  Captain Swan completed two lengthy successful war time deployments exposed to hostile fire and death, faced national emergency stop loss - as a result long wait times for a career course and command; helped the Army with a large unit transition, had excellent OERs, invested 10 years faithfully serving his country.  It shocks the conscience and offends equity to sacrifice him - terminate his regular Army career as a rude joke missing the clock of 3 more months in command.

12.  In 2019 Swan appealed to the BCMR. He asked to void his non-selections for promotion, and adjust his subsequent selection for promotion to Major so competitive with his peers, reinstate to active duty with back pay and allowances.  Porter is on point, where that BCMR denied his request to void the nonselections with reinstatement, but went ahead and recognized records otherwise showing a prima face case for an SSB.  So the BCMR instead referred him to an SSB to make the ultimate determination whether Porter would not have been promoted anyway.

13.   In Swan the BCMR considered voiding his nonselections and direct promote, and denied it.  It also considered referring him to SSB. Under Porter the BCMR had a duty to consider in the alternative to direct promote, after a prima facie case.  This occurred in Swan by looking at his Board's decision where it included in detail and cited regulatory and statutory "References" that it relied on. These state precisely provisions for SSB -

> Army Regulation (AR) 600-8-29 (Officer Promotions) * * *
> a. Paragraph 7-2 states the SSBs may be convened under Title 10, USC, section 628 to consider or reconsider ... officers for promotion when Headquarters Department of the Army discovers one or more of the following: * * *
> (2) The board that considered an officer from in or above the promotion zone acted contrary to law or made a material error (SSB discretionary).
> (3) The board that considered an officer from in or above the promotion zone did not have before it some material information (SSB discretionary).

The BCMR then went on and under its References for direct promotions, such as when voiding nonselections-

---

[11] Sanders v. United States, 219 Ct.Cl. 285, 314 (1979)(en banc)(citing Yee v. United 206 Ct.Cl. 1388, 1396 (1975)(unexplained gaps in officers records prejudice chance for promotion, record if filled with prejudicial information and omits documents equally pertinent which might mitigate the adverse impact existing information an legal error or injustice); Cf, Haselwinder v. McHugh 774 F.3d 990,998 (D.C..cir.2014)((BCMR has duty to correct injustice to recreate missing record for eligibility of Purple Heart award even though report never existed).

c. Paragraph 7-11, officers who discover that material error existed in their file at the time they were non-selected for promotion may request reconsideration.
5. The ABCMR may correct an officer's date of rank/effective date of rank when a proper appointment has already occurred.
a. Title 10 USC 624 and 741 provide for situations in which properly appointed officers are provided "backdated" dates of rank and effective dates to remedy errors or inequities affecting their promotion. The authority to remedy these errors or inequities is given to the Service Secretaries.

Swan BCMR decision at 20-21 paragraph 4-5.

14.   The error is the BCMR considered both SSB and direct promote situations but used the wrong harmless error test for both.  In fact it used the near impossible "but for" test to probe into the secret board deliberations to discover the minds of promotion board members --

The Board carefully considered the applicant's request, supporting documents and evidence in the records. * * * The Board was unable to determine the reasons for his nonselection as those *are not made available following promotion boards* and found insufficient evidence that his assignment history *was the sole reason* for his nonselection. Based on a preponderance of evidence, the Board determined that the applicant's non-selection for promotion and separation from active duty was not in error or unjust.

BCMR paragraph 12 [emphasis added].

15.   Here the Board applied the wrong harmless error test because Swan need only show lack of 12 rated months command time was an error or injustice that "might have affected the outcome of the board's decision...not the "but for" sole reason test.  It also ignored Army official positions that identified an error or injustice that might have affected his promotion non-selections.

16.   The BCMR  considered him for an SSB based on explicit regulations and statutory citations that it relied,- and because the record is plain Swan made a *prima facie* case - yet the Board applied the wrong test or ignored the lesser SSB test.  If the board did apply a different test, it failed to articulate its rationale for denying the SSB, to include whether Swan would not have been promoted in any event.

17.   Failing to apply the correct test, or failing to articulate it's SSB rationale, the decision was arbitrary and capricious.  The case should be remanded to either grant an SSB relook, or to have the BCMR reconsider SSB under the appropriate harmless error test, or to articulate its rationale for denying an SSB.

CAUSE OF ACTION

That the 2021 Secretary's decision denying alternative relief of an SSB violated the Administrative Procedure Act as an arbitrary and capricious agency action.

PRAYER FOR RELIEF

That this Honorable Court declare that the Secretary's decision  was arbitrary and capricious agency action.

That the Court order a remand of this case to the Secretary to reconsider its 2021 decision.

That this Honorable Court grant attorney fees.

Respectfully Submitted,

a/s
John Wickham
DC Bar 454863
32975 Saint Moritz Drive
Evergreen, CO 80439
303 670-3825 fax: 303 670-1586
wickham1@wispertel.net

Counsel for Plaintiff Stephen Swan

11